ASSET PURCHASE AGREEMENT

BETWEEN

AMY RUTH, INC.

AS SELLER

AND

MORNING STAR RESTAURANT GROUP LLC

AS PURCHASER

Dated as of January 8, 2007

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of January 8, 2007 by Amy Ruth, Inc. ("Debtor" or "Seller") as debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code, and Morning Star Restaurant Group LLC ("Purchaser").

## RECITALS

WHEREAS, Seller is engaged in the business of operating restaurants;

WHEREAS, on September 28, 2005, Debtor filed voluntary petitions for relief under Chapter 11 of Title 11 of the Untied States Code (the "Bankruptcy Code") with the Bankruptcy Court. Debtor has continued in the possession of its assets and in the management of its business pursuant to sections 1107 and 1008 of the Bankruptcy Code; and

WHEREAS, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, certain of the assets associated with Seller's operations, free and clear of all Encumbrances (as defined below), all on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1

## DEFINITIONS

**Section 1.1.     Definitions.** Unless otherwise defined herein, the terms defined in the introductory paragraph and the Recitals to this Agreement shall have the respective meanings specified herein, and the following terms shall have the meanings specified below:

"**Agreement**" has the meaning set forth in the introductory paragraph and shall include all Schedules and Exhibits hereto.

"**Ancillary Agreements**" means, collectively, the Assignment and Assumption Agreement, the Bill of Sale and Assumption Agreement, and the Intellectual Property Rights Assignment Agreement.

"**Assigned Contracts**" means the assigned leases and assigned licenses and contracts listed on **Schedule 1** hereto to be assigned by Seller to Purchaser pursuant to this Agreement.

**"Assignment and Assumption Agreement"** means the Assignment and Assumption Agreement to be executed at Closing for the Assigned Contracts, in substantially the form attached hereto as **Exhibit A.**

**"Assumed Contracts"** has the meaning set forth in **Section 2.2.**

**"Bankruptcy Code"** means The Bankruptcy Reform Act of 1978, as heretofore and after amended, and codified as 11 U.S.C. Section 101, et seq.

**"Bankruptcy Court"** means the United States Bankruptcy Court of the Southern District of New York, or any other court, having jurisdiction over the case from time to time.

**"Bid"** has the meaning set forth in **Section 9.2(b).**

**"Bidding Protections Order"** substantially in the form attached hereto as Exhibit D.

**"Bill of Sale and Assumption Agreement"** means the Bill of Sale and Assumption Agreement to be executed at Closing by Purchaser and Seller in substantially the form attached hereto as **Exhibit B.**

**"Breakup Fee"** has the meaning set forth in **Section 9.2(d).**

**"Business Day"** means a day, other than a Saturday or a Sunday, on which commercial banks are not required or authorized to close in the City of New York.

**"Case"** means the chapter 11 case of Seller pending in the Bankruptcy Court and being jointly administered for procedural purposes as In re: Amy Ruth, Inc. Case No. 05-19025.

**"Closing"** has the meaning set forth in **Section 9.1.**

**"Closing Date"** has the meaning set forth in **Section 9.1.**

**"Closing Date Payment"** has the meaning set forth in **Section 2.3(b).**

**"Code"** means the Internal Revenue Code of 1986, as amended.

**"Encumbrances"** means any mortgage, pledge, security interest, charge, adverse claim, encumbrance or any other restrictions or third party rights.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**"Escrow Agreement"** means the Escrow Agreement by and among Purchaser, Seller and the Escrow Agent in substantially the form attached as **Exhibit D** hereto.

**"Executory Contracts"** means all Assigned Contracts entered into by or assigned to Seller before September 28, 2005 and which are executory or unexpired as of the Closing Date.

**"Governmental Agency"** means the (a) any federal, state, county, local or municipal governmental or administrative agency or political subdivision thereof; (b) any governmental authority, board, bureau, commission, department or instrumentality; and (c) any court or administrative tribunal.

**"Intellectual Property Rights"** means, whether domestic or foreign, Debtor's corporate name, trademarks, tradenames, copyrights and copyright applications and all website domain names and websites owned by Seller set forth on **Schedule 3** hereto.

**"Intellectual Property Rights Assignment Agreement"** means the agreement, substantially in the form attached hereto as **Exhibit E,** pursuant to which Seller will, on the Closing Date, sell and assign all of their right, title and interest in and to the Debtor's Intellectual Property Rights to Purchaser, free and clear of Seller's existing contractual restrictions and provisions, and Encumbrances.

**"Inventory and Equipment"** means the items of inventory and equipment, in the categories set forth on **Schedule 2** hereto, owned by Seller and on hand at the Locations on the Closing Date.

**"Knowledge"** as applied to Seller means the actual knowledge of the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Chief Legal Officer or the General Counsel of the Debtor and as applied to Purchaser means the actual knowledge of its Chief Executive Officer, Chief Financial Officer, the Chief Legal Officer or the General Counsel.

**"Locations"** means Debtor's restaurant at 111-113 West 116th Street, New York, NY 10026.

**"Order"** means an order of the Bankruptcy Court, in substantially the form attached hereto as **Exhibit C**, which order, as of the Closing Date, shall not have been stayed, vacated or otherwise rendered ineffective, authorizing, among other things (a) the sale of the Purchased Assets to Purchaser free and clear of all Encumbrances, (b) the assignment of the Assigned Contracts by Purchaser and (c) the consummation of the transactions contemplated hereby and containing a finding that Purchaser is a good faith purchaser for value within the meaning of Section 363(m) of the Bankruptcy Code.

**"Permit"** means any permit, approval, authorization, license, variance or permission required by a Governmental Agency under any applicable law.

**"Person"** means any individual, partnership, corporation, trust, association, limited liability company, Governmental Agency or other entity.

**"Purchase Price"** has the meaning set forth in **Section 2.3(a).**

**"Purchased Assets"** means all of Seller's right, title and interest as of the Closing Date in and to the following:

(a)    the Assigned Contracts set forth on **Schedule 1** to this Agreement.

(b)    the Inventory and Equipment set forth on **Schedule 2** to this Agreement;

(c)    the Intellectual Property Rights set forth on **Schedule 3** to this Agreement;

(d)    records relating primarily to the Purchased Assets set forth on **Schedule 4** to this Agreement;

**"Qualifying Bid"** has the meaning set forth in **Section 9.2(c)**

**"Schedules"** means the various Schedules referred to in this Agreement delivered separately to Purchaser on or before the date of this Agreement, except as otherwise specified in this Agreement.

**"Superior Bid"** has the meaning set forth in **Section 9.2(b)**

**"Tax Return"** means any report, return, information return, filing, claim for refund or other information, including any schedules or attachments thereto, and any amendments to any of the foregoing required to be supplied to a taxing authority in connection with Taxes.

**"Taxes"** means all federal, state, local and foreign taxes, including income, gross receipt, excise, employment, sales, use, transfer, license, payroll, franchise, severance, stamp, withholding, Social Security, unemployment, disability, real property, personal property, registration, alternative or add-on minimum, estimated or other tax, including any interest, penalties or additions thereto, whether disputed or not.

**"Trademarks"** means the domestic and international trademarks and service marks (registered or unregistered) and trade names, and all goodwill of the business associated therewith and licenses and registrations relating thereto, listed on **Schedule 3** attached hereto.

**"Transaction Taxes"** has the meaning set forth in **Section 10.1.**

**Section 1.2.    Accounting Terms and Determinations.**  All references in this Agreement to **"generally accepted accounting principles"** or **"GAAP"** shall mean generally accepted accounting principles in effect in the United States of America at the

time of application thereof. Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made and all financial statements and certificates and reports as to financial matters required to be furnished hereunder shall be prepared in accordance with generally accepted accounting principles applied on consistent basis.

## ARTICLE 2

## PURCHASE AND SALE OF PURCHASED ASSETS AND ASSUMPTION OF ASSUMED CONTRACTS

**Section 2.1.   Purchase and Sale of Purchased Assets.**
   (a)      On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser, all of Sellers' right, title and interest in and to the Purchased Assets free and clear of all Encumbrances, provided, however, that Seller shall be entitled to retain copies of all books and records, in whatever form, included in the Purchased Assets.

   (b)      Purchaser acknowledges that it shall not require any right, title or interest in any property, asset or right of Seller that is not a Purchased Asset or other asset required by Purchaser hereunder, including rights of Seller to any vendor discounts, credits, rebates or other amounts, and claims of Seller against third parties in respect hereof.

**Section 2.2.   Assumption of Contracts.**
   (a)      On the terms and subject to the conditions set forth in this Agreement, from and after the Closing, Purchaser will assume and pay, perform, discharge and be responsible for (collectively, the **"Assumed Contracts"**) all obligations and liabilities of Seller under or related to the Assigned Contracts contained herein which accrue from and after the Closing Date.

   (b)      Purchaser shall not assume or pay, perform, discharge or be responsible for any of the obligations or liabilities of Seller other than (i) to reimburse Seller, on the Closing Date, in the amount of Eleven Thousand Five Hundred ($11,500) Dollars, such sum representing the amount required to cure Seller's obligations and/or defaults under the Lease Agreement between 101-115 West 116th Street Realty Corp. and Seller, as amended and modified by that certain Agreement dated October 21, 2004, for the premises known as 111-113 West 116th Street, New York, New York (collectively, as amended, the "Lease"); and (ii) the obligations under the Assumed Contracts and liabilities assumed, incurred or created under the Ancillary Agreements which accrue from and after the Closing Date.

   (c)      Without limited the generality of the foregoing provisions of this Section 2.2, Purchaser shall not assume or pay, perform, discharge or be responsible for any of

the obligations or liabilities of Seller pursuant to any contract or agreement that is not an Assumed Contract.

### Section 2.3. Purchase Price; Payment of Purchase Price.

(a)     On the terms and subject to the conditions set forth in this Agreement, the purchase price (the "Purchase Price") for the Purchased Assets shall be an aggregate amount equal to Four Hundred Seventy-Five Thousand ($475,000) Dollars, less (i) all amounts necessary to cure defaults on all Assigned Contracts and to pay any actual or pecuniary losses that resulted from any defaults by Debtor, and less (ii) that amount of professional compensation fixed by the Bankruptcy Court in the Case for payment to Alter, Goldman & Breschia, LLP, attorneys for the Debtor, including allowances pursuant to Bankruptcy Code §503.  On the date hereof, Purchaser shall deposit into an interest bearing account established in accordance with the terms of the Escrow Agreement as a good faith deposit towards the payment of the Purchase Price cash in an amount equal to Forty-Seven Thousand Five Hundred ($47,500) Dollars (the "Deposit").

(b)     On the Closing Date, Purchaser shall pay to Seller in cash by wire transfer of immediately available funds (pursuant to written instructions to be provided by Seller to Purchaser), an amount equal to the Purchase Price less the Deposit and any payment into the escrow account established under the Escrow Agreement (the "Closing Date Payment").  The Closing Date Payment shall be adjusted pursuant to **Section 2.3(a)**.  Purchaser shall pay the remainder of the Purchase Price pursuant to this section.  The Deposit shall remain in Escrow after the closing and shall be distributed in accordance with the Escrow Agreement and the terms hereof.

### Section 2.4. Condition of Purchased Assets.  Except for the warranty of title and the other representations, warranties and covenants contained herein, the Purchased Assets are being sold "AS IS", "WHERE IS" and "WITH ALL FAULTS" but free and clear of all Encumbrances, and Seller hereby expressly disclaims any and all other warranties both express and implied.

### Section 2.5. Allocation of Purchase Price.  To the extent required by law after the Closing Date, Purchaser and Seller shall prepare and file those statements or forms (including Form 8594) required by Section 1060 of the Code and the Treasury regulations thereunder and shall file such statements or forms with their respective federal income Tax Returns.  The parties shall prepare such statements or forms consistently with any agreed allocation of all or a portion of the Purchase Price to the Purchased Assets.  Each party shall provide the other party with a copy of such statements or forms as filed.  Such allocation of the Purchase Price will not be binding in the Case upon Seller's creditors or other parties in interest and will not have precedential value with respect to any allocations of value contained in a plan or plans under Chapter 11 of the Bankruptcy Code involving Seller.

### Section 2.6. Sale at Closing Date.  The sale, transfer, assignment and delivery by Seller of the Purchased Assets to Purchaser, and the assumption by Purchaser of the

Assumed Contracts as herein provided, shall be effected on the Closing Date by the execution and delivery by Seller and Purchaser of an Assignment and Assumption Agreement for the Assigned Contracts, substantially in the form of **Exhibit A.** With respect to the other Purchased Assets and Assumed Contracts, Seller shall execute and deliver to Purchaser a Bill of Sale and Assumption Agreement substantially in the form of **Exhibit B.**

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF SELLER

Subject to **Section 3.9,** Seller represents and warrants to Purchaser as follows:

**Section 3.1.    Authority of Seller.** Seller is a corporation validly existing and in good standing under the laws of the State of New York. Seller has full corporate power and authority to execute and deliver this Agreement and each of the Ancillary Agreements signed by it, and the execution and delivery by Seller of this Agreement and the Ancillary Agreements signed by it and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action on the part of Seller other than the receipt of stockholder approval and this Agreement constitutes, and each of the Ancillary Agreements upon its execution will constitute, the legal, valid and binding obligation of Seller enforceable in accordance with its terms, subject to receipt of the Order. Subject to any necessary authorization from the Bankruptcy Court, Seller has full corporate power and authority to own its properties and to carry on any business operations at the Locations presently being conducted by it, and upon the entry of the Order, Seller will have all power and authority to take all actions necessary or appropriate to close the transactions contemplated by this Agreement. To Seller's Knowledge the Schedules hereto are complete and the Debtor's books and records have been prepared and maintained in the ordinary course of business.

**Section 3.2.    No Conflict or Violation.** The execution, delivery and performance by Seller of this Agreement and the Ancillary Agreements do not and will not violate or conflict with any provision of the Certificate of Incorporation or By-laws of Seller.

**Section 3.3.    Compliance with Law.** Except as set forth on **Schedule 5** hereto, to Seller's Knowledge, Seller has not received written notice of any material violation of any law, regulation or order, and is not in default in any material respect under any order, writ, judgment, award, injunction or decree of any Governmental Agency, applicable to the Purchased Assets.

**Section 3.4.    Ownership of Purchased Assets.** Except as set forth on **Schedule 6** hereto, Seller is the owner of the Purchased Assets existing as of the date hereof. Subject to the issuance of the Order and except as set forth on **Schedule 6** hereto, Seller will have, and at the Closing Purchaser will receive, good and valid title to the Purchased Assets, free and clear of any Encumbrances. Subject to receipt of the Order, Seller has full power and authority to use all third party trademarks used in connection with its

business, except to the extent the failure to have power and authority will not have a material adverse affect on the Purchased Assets.

Section 3.5. **Assigned Contracts.** True and complete copies (including all modifications and amendments) of the Assigned Contracts listed on **Schedule 1** have been provided or made available by Seller to Purchaser. Other than as set forth on **Schedule 1,** neither Seller nor, to Seller's Knowledge, any other party under any of the Assigned Contracts, has commenced any action against the other or given or received any written notice of any material default or violation under any Assigned Contract which was not withdrawn or dismissed, except only for those defaults which will be cured by Seller in accordance with the Order (or which need not be cured under the Bankruptcy Code to permit the assumption and assignment of Executory Contracts). The Assigned Contracts listed on **Schedule 1** are or will, at the Closing, be valid, binding and in full force and effect, except as otherwise set forth on **Schedule 1.**

Section 3.6. **Litigation.** Other than in connection with the Case and except as set forth on **Schedule 7** hereto, there are no actions, causes of action, claims, suits or proceedings pending or, to Seller's Knowledge, threatened against Seller which (a) seek to restrain or enjoin the consummation of the transactions contemplated hereby or (b) could reasonably be expected to have a material adverse effect with respect to the Purchased Assets.

Section 3.7. **Brokers.** All negotiations relative to this Agreement and the transactions contemplated hereby have been carried on by Seller without the intervention of any other Person acting on Seller's behalf in such manner as to give rise to any valid claim by any such Person against Purchaser for a finder's fee, brokerage commission or other similar payment based on an arrangement with Seller.

Section 3.8. **Intellectual Property Rights. Schedule 3** hereto is a true and complete list of all Trademarks and Intellectual Property of Seller. Other than as set forth on **Schedule 3,** no claim is pending or, to Seller's Knowledge, threatened against Seller to the effect that any Trademarks or Intellectual Property Rights owned or licensed by Seller are invalid or unenforceable by Seller.

Section 3.9. **Inventory and Equipment. Schedule 2** annexed hereto is a true and complete list of all Inventory and Equipment of Seller. Other than as set forth on **Schedule 2,** no claim is pending or, to Seller's knowledge, threatened against Seller to the effect that a third party has any claim against said Inventory or Equipment or that said Inventory or Equipment was encumbered in any way.

Section 3.10. **Disclaimer of Additional Representations and Warranties; Schedules.**

(a)     Except as expressly set forth in this Agreement, the Schedules and Exhibits hereto, the Ancillary Agreements, and any certificate or instrument delivered pursuant to the terms hereof or thereof, Seller makes no representations or warranties

with respect to its business or its operations, Assets, (including, without limitation, the Purchased Assets), liabilities (including, without limitation, the Assumed Contracts) or conditions, including, with respect to the Purchased Assets, any representation or warranty of merchantability, suitability or fitness for a particular purpose, or quality as to the Purchased Assets, or any part thereof, or as to the condition or workmanship thereof, or the absence of any defects therein, whether latent or patent. Except as provided in this Agreement, the Schedules and Exhibits hereto, the Ancillary Agreements, and any other certificate or instrument delivered pursuant to the terms hereof or thereof, the Purchased Assets are to be conveyed hereunder free and clear of all Encumbrances "AS IS," "WHERE IS" and "WITH ALL FAULTS" on the date hereof and in their present condition, subject to reasonable use, wear and tear between the date hereof and the Closing Date, and Purchaser shall rely upon its own examination thereof.

(b)      Any item disclosed on any one Schedule shall be deemed to be disclosed on such Schedules, when relevant. Disclosure of an item on any Schedule shall not be deemed to be an admission that such item is material.

**Section 3.11.    Consents and Approvals.** Subject to the receipt of the Order, the execution, delivery and performance by Seller of this Agreement does not require the consent or approval of, or filing with, any Governmental Agency or other Person except such consents, approvals and filings, the failure to obtain or make which would not, individually or in the aggregate, have a material adverse effect on its ability to consummate the transactions contemplated hereby.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrant to Seller as follows:

**Section 4.1.    Authority of Purchaser.** Purchaser is a limited liability company, validly existing, and in good standing under the laws of the State of New York. Purchaser has full power and authority to execute and deliver this Agreement, and the execution and delivery by Purchaser of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all corporate action on the part of Purchaser, and this Agreement constitutes, and the Ancillary Agreements when executed will constitute, the legal, valid and binding obligations of Purchaser enforceable in accordance with their terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, moratorium, or similar laws from time to time in effect which affect creditors' rights generally and by legal and equitable limitations and enforceability of specific remedies. Purchaser has full power and authority to own its own properties and to carry on business presently being conducted by it.

**Section 4.2.    No Conflict or Violation.** The execution, delivery and performance by Purchaser of this Agreement and the Ancillary Agreements do not and

will not violate or conflict with any provision of the Articles of Organization or Operating Agreement of Purchaser and do not and will not violate any provision of law, or any order, judgment, decree of any court or other Governmental Agency applicable to Purchaser, or violate or result in a material breach of or constitute (with notice or lapse of time or both) a material default under any loan agreement, mortgage, security agreement, indenture or other instrument to which Purchaser is a party or by which it is bound.

**Section 4.3.   Consents and Approvals.**  The execution, delivery and performance by Purchaser of this Agreement does not require consent or approval of, or filing with, any Governmental Agency or other Person except such consents, approvals and filings, the failure to obtain or make which would not, individually or in the aggregate, have a material adverse effect on its ability to consummate the transactions contemplated hereby.

**Section 4.4.   Availability of Funds.**  Purchaser has and will have at the Closing the committed financing, which will be sufficient to allow it to pay the Purchase Price at the times and in the manner set forth in this Agreement and to satisfy all of its other obligations under this Agreement.

**Section 4.5.   Litigation.**  There are no actions, causes of action, claims, suits, proceedings, orders, writs, injunctions, or decrees pending or, to the Knowledge of Purchaser, threatened against Purchaser at law or in equity or before or by any Governmental Agency, which seeks to restrain or enjoin the consummation of the transactions contemplated hereby or that could otherwise materially adversely affect the ability of Purchaser to perform its obligations hereunder.

**Section 4.6.   Brokers.**  All negotiations relative to this Agreement and the transactions contemplated hereby have been carried on by Purchaser without the intervention of any other Person acting on its behalf in such manner as to give rise to any valid claim by any such Person against Seller or its Affiliates for a finder's fee, brokerage commission or other similar payment based on an arrangement with Purchaser.

## ARTICLE 5

## CERTAIN COVENANTS OF SELLER

Seller covenants with Purchaser that from and after the date hereof through the Closing Date:

**Section 5.1.   Conduct of Business Before the Closing Date.**  Seller shall not, except as required or contemplated by this Agreement, enter into any transaction respecting the Purchased Assets, other than in the ordinary course of Seller's business or other transactions in the ordinary course of Seller's business in the Case consistent with Seller's past practices or as otherwise contemplated by this Agreement.

**Section 5.2.    Consents and Approvals.**  Subject to Section 9.2. and Seller's right to accept a higher or otherwise better offer, Seller shall use commercially reasonable efforts to obtain entry of the Order by the Bankruptcy Court.

**Section 5.3.    Information and Access.**  Seller will permit representatives of Purchaser to have reasonable access during normal business hours after reasonable notice from Purchaser to Seller, and in a manner so as to not substantially interfere with normal operations, to all premises, properties, personnel, accountants, books, records, contracts and documents of or pertaining to the Purchased Assets.  Purchaser and each of its representatives will treat and hold such information as confidential.  Purchaser shall indemnify, defend and hold harmless Seller and their respective Affiliates from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, reasonable attorney's fees and disbursements) suffered or incurred by such Persons and directly caused by Purchaser and/or Purchaser's representatives' entry upon the premises or property of Seller or by any other activities undertaken by Purchaser or Purchaser's representatives with respect to the premises or property of Seller pursuant to this **Section 5.3.**  The parties hereto agree and acknowledge that the obligations of Purchaser under this Agreement are not subject to any "due diligence" condition and that the provisions of this **Section 5.3** shall in no way affect the conditions set forth in Article 8 of this Agreement, which shall be effective in accordance with their terms.

**Section 5.4.    Further Assurances.**  Upon the request of Purchaser at any time after the Closing Date, Seller shall, at Purchaser's expense, forthwith execute and deliver such documents as Purchaser or its counsel may reasonably request to effectuate the purposes of this Agreement.

**Section 5.5. Assignment of Contracts.**  Seller shall use commercially reasonable efforts to obtain from the Bankruptcy Court an order authorizing Seller, effective on the Closing Date, to assume, cure all monetary defaults with respect to and assign the Assigned Contracts to Purchaser.

**Section 5.6.    Cure of Defaults.**  Seller shall, subject to the occurrence of the Closing Date, (i) at its expense cure any and all monetary defaults and (ii) use commercially reasonable efforts to cure any other defaults, each with respect to the Assigned Contracts as required by Section 365 of the Bankruptcy Code, so that such Assigned Contracts may be assigned to Purchaser in accordance with the provisions of Section 365 of the Bankruptcy Code.

**Section 5.7.    Bankruptcy Actions.**  No later than five (5) Business Days after the date hereof, Seller will file a motion with an attached proposed order, which motion will be in form and substance reasonably acceptable to Seller and Purchaser, seeking approval of terms of this Agreement.

# ARTICLE 6

## CERTAIN CONVENTANTS OF PURCHASER

**Section 6.1.    Consents and Approvals.** Purchaser shall use commercially reasonable efforts to assist Seller in obtaining the Order and in obtaining Bankruptcy Court approval for assignment of the Assigned Contracts, including providing testimony as required at any hearing before the Bankruptcy Court.

**Section 6.2.    Adequate Assurances Regarding Executory Contracts.** With respect to each Assigned Contract, Purchaser shall make commercially reasonable efforts to provide adequate assurance as required under the Bankruptcy Code of the future performance of such Assigned Contract by Purchaser. Purchaser agrees that it will promptly take all actions reasonably required by Seller to assist in obtaining the Bankruptcy Court's entry of the Order, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making Purchaser's employees and representatives available to testify before the Bankruptcy Court, with respect to demonstrating adequate assurance of future performance by Purchaser under the Assigned Contracts.

**Section 6.3.    Performance under Assigned Contracts.** Purchaser agrees that from and after the Closing Date it shall (i) assume all obligations and liabilities of Seller under the Assigned Contracts which accrue from and after the Closing Date, (ii) take all actions necessary to satisfy its obligations and liabilities under the terms and conditions of each of the Assigned Contracts, (iii) indemnify and hold harmless Seller for any damages, losses and liabilities arising out of a breach of this covenant, and (iv) indemnify and hold harmless Seller for any damages, losses and liabilities arising out of or relating to the Assigned Contracts that arise or accrue after the Closing Date.

**Section 6.4.    Further Assurances.** Upon the request of Seller at any time after the Closing Date, Purchaser shall, at Seller's expense, forthwith execute and deliver such documents as Seller or its counsel may reasonably request to effectuate the purposes of this Agreement.

# ARTICLE 7

## CONDITIONS TO SELLER'S OBLIGATIONS

The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction (unless waived in writing by Seller) of each of the following conditions on or prior to Closing Date:

**Section 7.1.    Representations and Warranties.** The representations, warranties and covenants of Purchaser contained in this Agreement shall be true in all material respects on and as of the Closing Date as though such representations and warranties were made on and as of the Closing Date.

**Section 7.2.  Compliance with Agreement.**  Purchaser shall have performed and complied in all material respects with all covenants and conditions to be performed or complied with by it on or prior to the Closing Date.

**Section 7.3.  Consents; No Injunctions.**  (a) Any consent required in connection with consummation of the transactions contemplated hereby shall have been obtained and shall be in full force and effect on the Closing Date, (b) No court or governmental authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation or non-appealable judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits consummation of the Closing.

**Section 7.4.  Purchaser's Closing Deliveries and Obligations.**  Purchaser shall have delivered all items and satisfied all obligations pursuant to Section 9.1(b).

**Section 7.5.  Entry of the Order.**  (a) The Bankruptcy Court shall have entered the Order and (b) the Order, as entered by the Bankruptcy Court, shall not be stayed and shall not modify the terms and conditions of this Agreement or the transactions contemplated hereby in any way that adversely affects Seller.  Notwithstanding anything to the contrary contained herein, if the sale and assigned of the Assigned Contracts is not approved under the Order for any reason, or because the Bankruptcy Court determines that Purchaser does not satisfy the conditions contained in Section 365 of the Bankruptcy Code with respect to Executory Contracts, such event shall at the option of Purchaser be deemed to be a failure of a condition precedent to the obligations of the parties hereto to consummate the transactions contemplated hereby.

## ARTICLE 8

## CONDITIONS TO PURCHASER'S OBLIGATIONS

This obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the satisfaction (unless waived in writing by Purchaser) of each of the following conditions on or prior to the Closing Date:

**Section 8.1.  Representations and Warranties.**  The representations and warranties of Seller contained in this Agreement shall be true in all material respects on and as of the Closing Date as though such representations and warranties were made on and as of the Closing Date.

**Section 8.2.  Compliance with Agreement.**  Seller shall have performed and complied in all material respects with all covenants and conditions to be performed or complied with by it on or prior to the Closing Date.

**Section 8.3.  Consents; No Injunctions.**  (a) Any consent required in connection with the consummation of the transactions contemplated hereby shall have

been obtained and shall be in force and effect on the Closing Date, and (b) No court or governmental authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation or non-appealable judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the Closing or imposes material limitations on Purchaser's ownership of the Purchased Assets.

**Section 8.4.** **Seller Closing Deliveries and Obligations.** Seller shall have delivered all items and satisfied all obligations pursuant to **Article 5 and Section 9.1(a).**

**Section 8.5.** **Entry of the Order.** (a) The Bankruptcy Court shall have entered the Order and (b) the Order, as entered by the Bankruptcy Court, shall not be stayed or modify the terms and conditions of this Agreement or the transactions contemplated hereby in any way that adversely affects Purchaser.

**Section 8.6.** **Assignment of Contracts.** The Bankruptcy Court shall have entered the Order, or an additional order that expressly authorizes the assumption by Seller and assignment to Purchaser of the Assigned Contracts, effective on the Closing Date. In addition, (i) Seller shall have cured all defaults under the Assigned Contracts and pay all liabilities and obligations accrued prior to the Closing Date; and (ii) Purchaser shall have reimbursed Seller, on the Closing Date, in the amount of Eleven Thousand Five Hundred ($11,500) Dollars, such sum representing the amount required to cure Seller's obligations and/or defaults under the Lease.

## ARTICLE 9

## THE CLOSING; OTHER BIDS; TERMINATION

**Section 9.1.** **The Closing.** The Closing of the purchase and sale of the Purchased Assets (the "**Closing**") shall be held on the second Business Day after the date of entry of the final Order (the "**Closing Date**"). The Closing shall be held at the offices of Beigelman & Associates, P.C., 805 Third Avenue, 20th Floor, New York, New York 10022. At the Closing, all of the transactions provided for in **Sections 9.1(a) and (b)** hereof shall be consummated on a substantially concurrent basis.

(a) **Seller's Deliveries at Closing.** At the Closing, Seller shall deliver (or cause to be delivered) to Purchaser the following:

(i) the duly executed Bill of Sale and Assignment and Assumption Agreement;

(ii) a copy of the entered Order;

(iii) the duly executed Intellectual Property Rights Assignment Agreement;

(iv)    certified resolutions of the Board of Directors of Seller approving and authorizing the transactions contemplated by this Agreement;

(v)    a certificate, executed by a duly authorized officer of Seller (x) to the effect that all conditions to Closing set forth in Section 8.1 and Section 8.2 have been satisfied, (y) as to the incumbency and signature of the officers of Seller executing any applicable agreements or documents; and

(vi)    a duly executed amendment to Seller's certificate of incorporation changing Seller's name to a name other than "Amy Ruth."

(b)    **Purchaser's Deliveries at Closing.**  At the Closing, Purchaser shall deliver (or cause to be delivered) to Seller the following:

(i)    payment of the Purchase Price and other amounts in accordance with the terms and conditions set forth in **Section 2.3(b);**

(ii)    a duly executed Assignment and Assumption Agreement as applicable for each Assigned Contract;

(iii)    the duly executed Intellectual Property Rights Assignment Agreement;

(iv)    certified resolutions of the members of Purchaser approving and authorizing the transactions contemplated by this Agreement; and

(v)    a certificate, executed by a duly authorized officer of Purchaser, to the effect that all conditions to closing set forth in **Section 7.1.** and **Section 7.2** have been satisfied.

## Section 9.2.    Other Bids; Fees.

(a)    <u>Bankruptcy Court Approval</u>.  Seller shall seek the Bidding Protections Order (the "Bidding Protections Order") from the Bankruptcy Court consistent with the provisions of this Section 9.2 and in form and substance to be approved by Seller and Purchaser, which approval will not be reasonably withheld or delayed and containing, among other things, (i) the definition of **"Superior Bid"** set forth in **Section 9.2(b)**; (ii) the overbid protections set forth in **Section 9.2(c)**; (iii) bid incentives and protections set forth in **Section 9.2(d)**; and (iv) certain auction rules.

(b)    <u>Other Bids</u>.  Purchaser acknowledges that pursuant to the Bidding Protections Order, Seller will solicit bids (**"Bids"**) from other prospective purchasers (collectively, **"Bidders"**) for the sale of the Purchased Assets in accordance with auction procedures set forth in the Bidding Protections Order. Seller shall have the right to select the highest Bid or Bids (the **"Superior Bid"**),

which will be solely determined by considering the total consideration to be received by Seller.  Seller will not consider Bids for the Purchased Assets, which contain a purchase price which is less than the Purchase Price set forth in this Agreement.

(c)     Overbid Protection.  Seller will seek to have the Bidding Protections Order contain the following overbid protections: (i) a higher Bid will not be considered by Seller unless such Bid is more than the sum of (w) the Purchase Price set forth in this Agreement as such amounts may be estimated in good faith by Seller and (x) the Breakup Fee (as defined in **Section 9.2(d)**); and (ii) any bids thereafter must be higher in increments of Five Thousand ($5,000) Dollars than the then existing highest or better bid (as determined in the reasonable discretion of Seller) ((i) and (ii) constituting, as applicable, a **"Qualifying Bid"**).

(d)     The Breakup Fee.  If Seller (i) determines that a Qualifying Bid (or Bids) (which is not Purchaser's Bid) is the Superior Bid, and (ii) executes a definitive agreement embodying such Superior Bid, Seller will pay Purchaser a break-up fee equal to Fourteen Thousand Two Hundred Fifty ($14,250) Dollars (the "**Breakup Fee**").  The Breakup Fee will be paid by Seller to Purchaser immediately upon receipt of a down payment or other monetary consideration from the entity providing the Superior Bid.

**Section 9.3.     Termination.**  Anything in this Agreement to the contrary notwithstanding, this Agreement and the transactions contemplated hereby may be terminated in any of the following ways at any time before the Closing and in no other manner:

(a)     by mutual written consent of Purchaser and Seller;

(b)     by Seller or Purchaser, if Seller accepts Superior Bid and executes a definitive agreement with respect thereto;

(c)     by Seller if Purchaser is in breach in any material respect of any of its representations made in this Agreement, or is in violation or default in any material respect of any of its covenants or agreements in this Agreement, if the breach, violation or default is not cured within five (5) Business Days after written notice by Seller;

(d)     by Purchaser, if Seller is in breach in any material respect of its representations made in this Agreement, or is in violation or default in any material respect of any of its covenants or agreements in this Agreement, if the breach, violation or default is not cured within five (5) Business Days after written notice by Purchaser;

(e)     by Purchaser, if, as a result of an order of the Bankruptcy Court a Chapter 7 Trustee is appointed with respect to Seller or Seller enters into any transaction

referred to in Section 5.1 (other than those permitted by such Section), and such change or transaction materially and adversely affects the benefits to be obtained by Purchaser pursuant to this Agreement;

(f)     by Purchaser or Seller if the Bankruptcy Court does not approve the Bidding Protection Order or amount of the Breakup Fee or the payment of the Breakup Fee in accordance with Section 9.2.

Notwithstanding anything to the contrary in this Agreement, in the event that Seller uses commercially reasonable efforts to obtain the Order and the Bankruptcy Court refuses to enter the Order, this Agreement shall terminate without liability or obligation of Seller to Purchaser.

**Section 9.4.    Effects of Termination.**  In the event that this Agreement is terminated pursuant to Section 9.3, except as provided in **Section 9.2(d)** or in this **Section 9.4,** all further obligations to the parties hereunder shall terminate and the Deposit, with all interest thereon, shall be immediately returned.  If this Agreement is terminated as permitted by **Section 9.3,** termination shall be without liability of any party (or any stockholder, director, officer, employee, agent, consultant or representative of such party) to the other party to this Agreement (except with respect to the return of the Deposit); provided, however, that (a) if such termination shall result under **Section 9.3(c),** Purchaser shall be liable for any and all losses, damages and expenses incurred or suffered by Seller as a result of such failure to perform or breach and as liquidated damages therefor the entire Deposit shall be paid to Seller and (b) if this Agreement is terminated by Seller or Purchaser pursuant to **Section 9.3(b)** or by Purchaser pursuant to **Section 9.3(d),** Purchaser shall be entitled, as its sole and exclusive remedy, to the Breakup Fee.

Except as specifically provided herein, this **Section 9.4** shall not limit the rights of the parties hereto to seek specific performance of any obligation hereunder of any other party.

## ARTICLE 10

## TAXES

The parties hereto hereby covenant and agree as follows:

**Section 10.1.  Taxes Related to Purchase of Assets.**  The parties recognize and acknowledge that they may be exempt under section 1146(a) of the Bankruptcy Code and the Order from state and local transfer, recording, stamp or other similar transfer taxes (collectively "Transaction Taxes") that may be imposed by reason of the sale, transfer, assignment and delivery of the Purchased Assets; provided, however, that if Transaction Taxes are assessed for any reason, Purchaser and Seller shall each pay one-half of such Transaction Taxes along with any recording and filing fees.  Purchaser and Seller agree to cooperate to determine the amount of Transaction Taxes payable in

connection with the transactions contemplated under this Agreement. Transaction Taxes shall not include any Taxes for which Seller is responsible. At the Closing, Purchaser shall remit to Seller such properly completed resale exemption certificates and other similar certificates or instruments as are applicable to claim available exemptions from the payment of sales, transfer, use or other similar taxes under applicable law. Purchaser and Seller will cooperate in preparing such forms and will execute and deliver such affidavits and forms as are reasonably requested by the other party.

### Section 10.2. Cooperation.

(a)     Purchaser and Seller agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Purchased Assets as is reasonably necessary for the preparation and filing of any Tax Return, for the preparation for and proof of facts during any tax audit, for the preparation for any tax protest, for the prosecution or defense of any suit or other proceeding relating to tax matters and for the answer of any governmental or regulatory inquiry relating to tax matters.

(b)     Purchaser agrees to retain possession of all files and records delivered to Purchaser by Seller for a period of at least three years from the Closing Date. If Purchaser determines to destroy or discard any such files or records after the end of such three-year period, Purchaser will give Seller reasonable notice thereof and will allow Seller to take possession of such files and records at Seller's expense. In addition, from and after the Closing Date, Purchaser agrees that it will provide reasonable access to Seller and their attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to such files and records provided to Purchaser by Seller as Seller may reasonably deem necessary to prepare for, file, prove, answer, prosecute or defend any claim, suit, inquiry or other proceeding, whether related to Taxes or otherwise.

## ARTICLE 11

## MISCELLANEOUS PROVISIONS

**Section 11.1. Representations and Warranties.** The representations and warranties of the parties to this Agreement made in this Agreement, subject to the exceptions thereto, will not be affected by any information furnished to, or any investigation conducted by, any of them or their representatives in connection with the subject matter of this Agreement. All representations and warranties contained in this Agreement shall not survive the Closing.

**Section 11.2. Notices.** All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when delivered personally to the recipient, (b) when sent to the recipient by telecopy (receipt electronically confirmed by sender's telecopy machine) if during normal business hours of the recipient, otherwise on the next Business Day or (c) one (1) Business Day after the date when sent to the

recipient by reputable express courier service (charges prepaid). Such notices, demands and other communications will be sent to Seller and to Purchaser at the addresses indicated below:

If to Purchaser:      Morningstar Restaurant Group LLC
c/o Beigelman & Associates, P.C.
805 Third Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 230-1300
Facsimile: (212) 230-1090

If to Seller:      Amy Ruth, Inc.
c/o Alter, Goldman & Breschia, LLP
550 Mamaroneck Avenue
Harrison, New York 10528
Telephone: (914) 670-0030
Facsimile: (914) 670-0031

or to such other address as either party hereto may, from time to time, designate in writing delivered pursuant to the terms of this Section.

**Section 11.3. Amendments.** The terms, provisions and conditions of this Agreement may not be changed, modified or amended in any manner except by an instrument in writing and duly executed by each of the parties hereto.

**Section 11.4. Assignment.** This Agreement is binding upon and insures to the benefit of the successors and assigns of each party of this Agreement (including any trustee appointed in respect of Seller under the Bankruptcy Code), but no rights, obligations or liabilities under this Agreement may be assigned to either party without the prior written consent of the other party hereto.

**Section 11.5. Announcements.** All press releases and general notices to customers and suppliers with respect to this Agreement and the transactions contemplated by this Agreement shall be approved by both Purchaser and Seller prior to the issuance thereof; provided that either party may make any public disclosure that it believes in good faith is required by law or regulation (in which case the disclosing party shall advise the other party prior to making such disclosure and provide such other party an opportunity to review the proposed disclosure).

**Section 11.6. Expenses.** Except as otherwise set forth in this Agreement, each party to this Agreement shall bear all of its own legal, accounting, investment banking and other expenses incurred by it or on its behalf in connection with the transactions contemplated by this Agreement, whether or not such transactions are consummated.

**Section 11.7. Entire Agreement.** This Agreement and the Ancillary Agreements constitute the entire agreement between the parties hereto with respect to the

subject matter hereof and supersede and are in full substitution of any and all prior agreements and understandings between them relating to such subject matter, provided, however, that any confidentiality agreements between Seller and Purchaser shall remain in full force and effect. The Exhibits and Schedules to this Agreement are hereby incorporated into and made a part hereof and are an integral part of this Agreement.

**Section 11.8. Descriptive Headings.** The descriptive headings of the several sections of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

**Section 11.9. Counterparts.** For the convenience of the parties, any number of counterparts of this Agreement may be executed by any one or more parties hereto, and each such executed counterpart shall be, and shall be deemed to be, an original, but all of which together shall constitute one and the same instrument.

**Section 11.10. Governing Laws; Jurisdiction.** This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of New York, without giving effect to the principles of conflicts of laws thereof. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties hereto irrevocably elect as the sole judicial forum for the adjudication of any dispute between Seller and Purchaser arising under or in connection with this Agreement, and consent to the jurisdiction of, the Bankruptcy Court. After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties hereto irrevocably elect as the sole judicial form for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, the courts of the County of New York, State of New York for the Southern District of New York.

**Section 11.11. Construction.** The language used in this Agreement will be deemed to be language chosen by the parties to express their mutual intent, and no rule of strict construction will be applied against either party. Any references to any federal, state, local or foreign statute or law will always refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. Unless the context otherwise requires: (a) a term that has the meaning assigned to it by this Agreement; (b) an accounting term not otherwise defined herein has the meaning assigned to it by GAAP; (c) the word "or" is not exclusive; (d) the words "include", "includes" and "including" shall be deemed to be followed by the words "without limitation"; (e) words in the singular include the plural and in the plural include the singular; (f) provisions apply to successive events and transactions; and (g) "$" means the currency of the United States of America.

**Section 11.12. Severability.** In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement or any other instrument. Furthermore, in lieu of any such invalid or unenforceable term or provision, the parties hereto intend that

there shall be added as a part of this Agreement a provision as similar in terms to such invalid or unenforceable provision as may be possible and be valid and enforceable.

**Section 11.13. Confidentiality.** Seller and Purchaser agree to keep, and to cause each of their affiliates, directors, officers, and employees to keep, confidential any and all confidential information of the other party that either receives in connection herewith or in the course of performing its obligations hereunder (except that such information may be shared, on a confidential basis, with the party's attorneys, lenders, and auditors) and will not, without the other party's consent, use any of such confidential information except as reasonably necessary to perform its duties under this or another of its agreements with the other party. Upon the termination of this Agreement, each party will return, and will cause its affiliates to return, to the other party all original documents and copies of the confidential information which are in its possession.

IN WITNESS WHEREOF, Seller and Purchaser have executed and delivered this Agreement as of the day and year written above.

AMY RUTH, INC.

By: _____
     CARL S. REDDING
     PRESIDENT/CEO


MORNING STAR RESTAURANT GROUP LLC


By: _____
     LAWRENCE JORDAN
     MANAGING MEMBER

there shall be added as a part of this Agreement a provision as similar in terms to such invalid or unenforceable provision as may be possible and be valid and enforceable.

**Section 11.13. Confidentiality.** Seller and Purchaser agree to keep, and to cause each of their affiliates, directors, officers, and employees to keep, confidential any and all confidential information of the other party that either receives in connection herewith or in the course of performing its obligations hereunder (except that such information may be shared, on a confidential basis, with the party's attorneys, lenders, and auditors) and will not, without the other party's consent, use any of such confidential information except as reasonably necessary to perform its duties under this or another of its agreements with the other party. Upon the termination of this Agreement, each party will return, and will cause its affiliates to return, to the other party all original documents and copies of the confidential information which are in its possession.

IN WITNESS WHEREOF, Seller and Purchaser have executed and delivered this Agreement as of the day and year written above.

AMY RUTH, INC.


By: _____
      CARL S. REDDING
      PRESIDENT/CEO


MORNING STAR RESTAURANT GROUP LLC

By _____
      LAWRENCE JORDAN
      MANAGING MEMBER

## SCHEDULE 1
## ASSIGNED CONTRACTS

1.      Lease Agreement between 101-115 West 116th Street Realty Corp. and
Amy Ruth Inc., as amended and modified by that certain Agreement dated October 21,
2004, for the premises known as 111-113 West 116th Street, New York, New York, for a
term of ten (10) years, to commence from November 15, 1998 until November 14, 2008.

2.      Agreement dated December 14, 2006 among Morning Star Restaurant
Group LLC, Amy Ruth, Inc. and 101-115 West 116th Street Realty Corp. for the premises
known as 111-113 West 116th Street, New York, New York, for a term of eight (8) years,
to commence from November 15, 2008 until November 14, 2016.

# SCHEDULE 2
## INVENTORY & EQUIPMENT

1. Office Computers
2. Desks
3. Cabinets
4. Tables & Chairs
5. Audio Equipment
6. Cooking Equipment
7. Refrigerators
8. Food & Perishables
9. Delivery Van
10. Motorscooter

**SCHEDULE 3**
**INTELLECTUAL PROPERTY RIGHTS**


1.      The trademark Amy Ruth's™ and such other trademarks, service marks, trade names, logos, emblems and indicia of origin as now or hereinafter used by Amy Ruth, Inc. in conjunction therewith to operate and promote Southern Cuisine ("Soul Food") full-service restaurants under the Amy Ruth's™ Restaurant brand and using previously developed proprietary products, proprietary processes, recipes and the like.

2.      All of Amy Ruth, Inc.'s common law rights to the usage of the names "Amy Ruth" and "Amy Ruth's".

3.      All of Amy Ruth, Inc.'s rights in the Amy Ruth's U.S. Trademark Registration Application No. 78/685,685.

4.      Website and website domain names (including, without limitation, www.amyruthsharlem.com), together with passwords and user IDs for domain registrar(s) and hosting company(ies).

5.      Amy Ruth, Inc.'s Restaurant recipe book with detailed instructions and ingredients for preparing food served by Amy Ruth's.

## SCHEDULE 4
## BUSINESS RECORDS
## RELATING TO THE PURCHASED ASSETS

1. All business records of Amy Ruth, Inc.

## SCHEDULE 5
## VIOLATIONS/DEFAULTS OF LAW

None

## SCHEDULE 6
## EXCEPTIONS TO OWNERSHIP OF
## PURCHASED ASSETS

None

## SCHEDULE 7
## LIST OF PENDING/THREATENED
## LITIGATION AGAINST SELLER

None

## BILL OF SALE AND ASSIGNMENT
## AND ASSUMPTION AGREEMENT

This BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of January 8, 2007, is made by and between Morning Star Restaurant Group LLC, a New York limited liability company ("Purchaser") and Amy Ruth, Inc., a New York corporation ("Seller").

### WITNESSETH:

WHEREAS, upon the terms and subject to the conditions set forth in that certain Asset Purchase Agreement dated as of January 8, 2007 (the "Asset Purchase Agreement") by and between Seller and Purchaser, Seller desires to sell, convey, transfer, assign and deliver to Purchaser and Purchaser desires to purchase and acquire from Seller, certain specified assets of Seller, and Purchaser shall assume certain specified liabilities of Seller, all as more fully described herein and therein.

NOW, THEREFORE, in consideration of the covenants and undertakings contained herein, and subject to the terms and conditions herein set forth, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

## ARTICLE II
## BILL OF SALE

Section 2.1.   Purchased Assets.  Seller hereby sells, conveys, transfers and assigns to Purchaser, free and clear of all Encumbrances all of the Purchased Assets set forth in Schedule 1 through 4 hereof.

## ARTICLE III
## ASSUMPTION OF LIABILITY

Section 3.1.   Liabilities Assumed.  Purchaser hereby agrees to assume the following Assumed Liabilities and obligations, but only to the extent such liabilities or obligations do not arise from or relate to any breach by Seller of any covenant, representation or warranty set forth in the Asset Purchase Agreement and only to the extent such liabilities or obligations relate to the Purchased Assets which are transferred and assigned to Purchaser pursuant to this Agreement.

(a)     Liabilities (excluding any and all cure costs for which Seller is obligated to pay pursuant to the Asset Purchase Agreement) arising after the Closing Date pursuant to Assigned Contracts that have been designated by Purchaser for assumption and assignment, as set forth in Schedule 1 of the Asset Purchase Agreement and assigned to Purchaser on the Closing Date in accordance with the terms hereof (collectively, the "Assigned Contracts"; and

(b)     All post-closing liabilities with respect to the Purchased Assets.

Section 3.2.   Excluded Liabilities.  Other than the Assumed Liabilities, Purchaser is not assuming and shall not be responsible or liable for and Seller shall retain, and shall indemnify, hold harmless and defend Purchaser from any liabilities or other obligations of either Seller (whether fixed, contingent, matured, or unliquidated, absolute or otherwise, known or unknown, and whether relating to any tort, statutory or regulatory obligation, environmental claim, Taxes, Contract, operations, professional fees or otherwise) (collectively, "Excluded Liabilities").

## ARTICLE IV
## MISCELLANEOUS

Section 4.1.   Further Assurances.  Each of the parties agrees to take or cause to be taken such further action, to execute, deliver and file or cause to be executed, delivered and filed such further documents and instruments, and to obtain such consents, as may be necessary or as may be reasonably requested in order to effectuate fully the purposes, terms and conditions set forth in Article II and Article III hereof.

Section 4.2.   Entire Agreement; Conflicts.  This instrument, together with the Asset Purchase Agreement and other agreements, instruments, certificates and documents executed are delivered in connection therewith, embodies the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings (whether or not written) relating to the subject matter hereof.  To the extent that this instrument conflicts in any manner with the Asset Purchase Agreement, the Asset Purchase Agreement shall control.

Section 4.3.   Amendment and Waiver.  Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by Seller and Purchaser, or in the case of the waiver, by the party against whom the waiver is to be effective.  No failure or delay by any party or parties in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Section 4.4.   Governing Law.  This shall instrument shall be governed by, and construed in accordance with, the laws of the State of New York without reference to the choice of law principles thereof.

Section 4.5. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall be considered one and the same instrument.

Section 4.6. <u>No Third Party Beneficiaries</u>. Nothing in this Agreement, express or implied, is intended to confer upon any Person other than Purchaser and Seller, or their successors or permitted assigns, any rights or remedies under or by reason of this Agreement.

Section 4.7. <u>Headings</u>. The headings contained in this instrument are for reference purposes only and shall not affect in any way the meaning or interpretation of this instrument.

Section 4.8. <u>Binding Effect</u>. This Agreement, and all of the terms and provisions hereof, shall be binding upon and shall inure to the benefit of the parties hereto, and their respective successors and permitted assigns.

Section 4.9. <u>Retention of Claims of Seller</u>. Notwithstanding anything in this Agreement or the Asset Purchase Agreement to the contrary, nothing contained in this Agreement or the Asset Purchase Agreement shall affect any right of Seller as or against any third party with respect to any Excluded Liabilities, which shall be unimpaired and undiminished hereby and thereby.

Section 4.10. <u>Power of Attorney</u>. Seller ("<u>Grantor</u>" hereby constitutes and appoints Purchaser, its successors and assigns, as Grantor's true and lawful attorney and attorneys, with full power of substitution, in Grantor's name and stead, but on behalf and for the benefit of Purchaser, its successors and assigns, to demand and receive any and all of the Purchased Assets, and to execute and deliver receipts, releases and such other instruments or documents as Purchaser may reasonably deem necessary or appropriate in connection with the demand and receipt of the same, and any part thereof, and from time to time to institute and prosecute in Grantor's name, or otherwise, for the benefit of Purchaser, its successors and assigns, any and all proceedings at law, in equity or otherwise, which Purchaser, its successors or assigns, may deem proper for the collection or reduction to possession of any of the Purchased Assets or for the collection and enforcement of any claim or right of any kind hereby sold, conveyed, transferred, and assigned, or intended so to be, and to do all act and things in relating to the Purchased Assets which Purchaser, its successors or assigns shall deem desirable, Grantor hereby declaring that the foregoing powers are coupled with an interest and are and shall be irrevocable by Grantor or by dissolution or in any manner or for any reason whatsoever.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Seller and Purchaser have duly executed and delivered this Agreement as of the date first written above.

**PURCHASER:**
Morning Star Restaurant Group LLC

By: _____
    LAWRENCE JORDAN
    MANAGING MEMBER

**SELLER:**
Amy Ruth, Inc.

By: _____
    CARL S. REDDING
    PRESIDENT/CEO

4

## ESCROW AGREEMENT

This ESCROW AGREEMENT (this "Agreement") dated as of January 8, 2007 is made among Morning Star Restaurant Group LLC, a New York limited liability company ("Purchaser"), Amy Ruth, Inc., a New York corporation ("Seller") and Alter, Goldman & Brescia, LLP ("Escrow Agent"), a New York limited liability partnership.

WITNESSETH:

WHEREAS, upon the terms and subject to the conditions set forth in that certain Asset Purchase Agreement dated as of January 8, 2007 (the "Asset Purchase Agreement") by and between Seller and Purchaser, Seller desires to sell, convey, transfer, assign and deliver to Purchaser and Purchaser desires to purchase and acquire from Seller, certain specified assets of Seller, all as more fully described herein and therein.

NOW, THEREFORE, in consideration of the covenants and undertakings contained herein, and subject to the terms and conditions herein set forth, the parties hereto agree as follows:

1. A. Escrow Agent shall hold the Deposit (unless otherwise specified, all capitalized terms used herein shall have the meaning attributed to them in the Asset Purchase Agreement) in escrow in a segregated bank account at: Signature Bank, N Switchele, NY until Closing or sooner termination of the Asset Purchaser Agreement and shall pay over or apply the Deposit in accordance with the terms of this Agreement. Escrow Agent shall hold the Deposit in an interest-bearing account for the benefit of the parties. If interest is held for the benefit of the parties, it shall be paid to the party entitled to the Deposit and the party receiving the interest shall pay any income taxes thereon. If interest is not held for the benefit of the parties, the Deposit shall be placed in an IOLA account or as otherwise permitted or required by law. The Social Security or Federal Identification numbers of the parties shall be furnished to Escrow Agent upon request.

B. At Closing, the Deposit shall be paid by Escrow Agent to Seller. If for any reason Closing does not occur and either party gives Notice (pursuant to Section 11.2 of the Asset Purchase Agreement) to Escrow Agent demanding payment of the Deposit, Escrow Agent shall give prompt Notice to the other party of such demand. If Escrow Agent does not receive Notice of objection from such other party to the proposed payment within ten (10) business days after the giving of such Notice, Escrow Agent is hereby authorized and directed to make such payment. If Escrow Agent does receive such Notice of objection within such ten (10) day period or if for any other reason Escrow Agent in good faith shall elect not to make such payment, Escrow Agent shall continue to hold such amount until otherwise directed by Notice from the parties to the Asset Purchase Agreement, this Agreement or a final, non-appealable judgment, order or decree of a court. However, Escrow Agent shall have the right at any time to deposit the Deposit and interest thereon with the clerk of a court in New York County and shall give Notice of such deposit to Seller and Purchaser. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrow Agent shall be relieved and discharged of all further obligations and responsibilities hereunder.

2. The parties acknowledge that Escrow Agent is acting solely as a stakeholder at their request and for their convenience and that Escrow Agent shall not be liable to either party for any

act or omission on its part unless taken or suffered in bad faith or in willful disregard of the Asset Purchase Agreement or this Agreement or involving gross negligence on the part of Escrow Agent. Seller and Purchaser jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrow Agent), indemnify and hold Escrow Agent harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrow Agent's duties hereunder, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the Asset Purchase Agreement or this Agreement or involving gross negligence on the part of Escrow Agent.

3.      Escrow Agent may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advise of such counsel.

4.      Escrow Agent acknowledges receipt of the Deposit by check (subject to collection) and Escrow Agent hereby agrees to the provisions of this Agreement by signing where indicated below.

5.      Escrow Agent or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Deposit or any other dispute between the parties whether or not Escrow Agent is in possession of the Deposit and continues to act as Escrow Agent.

6.      The party whose attorney is Escrow Agent shall be liable for loss of the Deposit.

        IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the date first written above.

MORNING STAR RESTAURANT                     AMY RUTH, INC.
GROUP LLC

By: _____                By: _____
    LAWRENCE JORDAN                             CARL S. REDDING
    MANAGING MEMBER                             PRESIDENT/CEO

                                            ALTER, GOLDMAN &
                                            BRESCHIA, LLP

                                            By: _____
                                                BRUCE ALTER
                                                PARTNER

2